IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| RANDY HUI, | ) | |
| | ) | |
| Plaintiff, | ) | No. 23 C 3430 |
| v. | ) | |
| | ) | Judge Virginia M. Kendall |
| MARCIN CHOJNACKI, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Randy Hui claims Defendants Laurena "Lori" Mikosz and Marcin Chojnacki tricked him into buying several run-down houses and apartment buildings. While holding themselves out as Hui's real-estate brokers, Mikosz and Chojnacki allegedly fed him false assurances about the buildings' condition and profitability. Behind the scenes, Mikosz's and Chojnacki's associates, the remaining Defendants, through "puppet entities," bought the buildings and resold them to Hui at a significant markup. Hui sued, alleging violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1962(c), (d), and various state-law claims. (Dkt. 1). Defendants now move to dismiss. (Dkt. 30). For the reasons below, the motion [30] is denied.

### BACKGROUND

**A.    The Flip Chicago Enterprise**

In the fall of 2020, Plaintiff Randy Hui, a California resident, saw an advertisement on the internet for "Flip Chicago." (Dkt. 1 ¶ 19). According to the advertisement, Flip Chicago helped real-estate investors buy, renovate, and quickly flip properties. (*Id.* at ¶ 20). The Flip Chicago website claimed that its system was "easy" and "[f]ree." (*Id.*; Dkt. 1-1). Upon seeing the advertisement, Hui sent a query to Flip Chicago. (Dkt. 1 ¶ 19). Defendant Lori Mikosz, replied

1

from Illinois, telling him that she and Defendant Marcin Chojnacki were licensed Illinois real-estate brokers and agents for Defendant Chase Real Estate LLC ("Chase RE"), an affiliate of Flip Chicago. (*Id.* at ¶¶ 22–23). Thus, "the transactions would be safely negotiated and consummated under the auspices of Chase Real Estate." (*Id.* at ¶ 23). At the time, Flip Chicago's website was "very similar" to Chase RE's website. (*Id.* at ¶ 24; *see* Dkts. 1-2, 1-3).

Chojnacki and Mikosz offered to help Hui buy and flip Real Estate Owned ("REO") properties—foreclosed properties for sale by lending banks at a "significantly discounted price." (Dkt. 1 ¶¶ 29–30). Mikosz and Chojnacki led Hui to believe that they would represent him as his agents, and Mikosz would use her professional relationships with REO banks to help Hui pursue offers. (*Id.* at ¶¶ 23, 33–34). After purchasing the REO properties, Mikosz proposed, Flip Chicago would help Hui renovate and "quickly" flip the properties for a profit. (*Id.* at ¶¶ 20, 50). To that end, Mikosz and Chojnacki promised Hui that their service providers would renovate the properties "in a cost effective and reasonable manner." (*Id.* at ¶ 51). Based on Mikosz's and Chojnacki's representations, Hui purchased three properties, although his allegations focus on one: 2241 North 72nd Court, Elmwood Park, Illinois ("Elmwood Park Property"). (*Id.* at ¶¶ 26, 45, 63).

On February 2021, Mikosz introduced Hui to the Elmwood Park Property through email, describing the property as a "foreclosure." (*Id.* at ¶¶ 64–65; Dkt. 1-6). Hui purchased the Elmwood Park Property for $235,000 from Defendant 1st Midwest Financial, Inc. ("1st Midwest"). (Dkt. 1 ¶¶ 66–68). Defendants continued to represent that Hui received a "great deal" at REO-level pricing. (*Id.* at ¶ 54). After closing on May 5, 2021, Mikosz and Chojnacki oversaw the renovations of the Elmwood Park Property. (*Id.* at ¶¶ 69, 71). Hui agreed to this arrangement because Mikosz and Chojnacki assured him that they had "significant experience with renovation oversight management," and they had worked with their trusted contractors for approximately ten years. (*Id.*

2

at ¶¶ 71–73). Hui also trusted the "Chase" name. (*Id.* at ¶ 73). Chase RE received a commission of $8,225 at the closing. (*Id.* at ¶ 70).

Unbeknownst to Hui, there was no REO bank, and there was no foreclosure. (*Id.* at ¶¶ 35, 67). Rather, 1st Midwest purchased the Elmwood Park Property for $210,000 from a private party who had owned the property through a land trust. (*Id.* at ¶ 67). Despite the name, the "imposter bank" 1st Midwest had no banking license. (*Id.* at ¶¶ 36–37, 46). It was an Illinois corporation headed by Defendant Kendall Murphy, an affiliate of Chojnacki. (*Id.* at ¶ 46). 1st Midwest's corporate filings list a "non-existent address" on "Midwest Road" in Northbrook, Illinois. (*Id.* at ¶ 47; Dkt. 1-4). Yet, the closing documents name 1st Midwest's address as "30W121 Estes Street in Naperville, Illinois," a foreclosure property. (Dkt. 1 ¶ 48; *see* Dkt. 1-5).

During the renovations, Hui paid Defendants' and their contractors' invoices, but the work was either not completed or haphazardly performed. (Dkt. 1 ¶¶ 74, 79). Without Hui's knowledge, Defendants funneled his renovation funds to Mikosz's husband's company, FNBO Property Management LLC, among Defendants' other affiliates. (*Id.* at ¶¶ 75, 79; Dkt. 1-7).

**B.** **The CitiPoint Enterprise**

Mikosz and Chojnacki also persuaded Hui to purchase multi-unit properties through Defendant CitiPoint Properties ("CitiPoint"). (*Id.* at ¶¶ 81, 85).[1] According to Defendants, CitiPoint helped real-estate investors find undervalued and underperforming properties—so-called "directly sourced" properties. (*Id.* at ¶¶ 83–84). CitiPoint promised "rapidly increasing equity and high cash flow." (*Id.* at ¶ 83). Mikosz and Chojnacki told Hui that CitiPoint introduced "mom and pop" property owners to investors. (*Id.* at ¶ 87). By purchasing property at a bargain and using the

---

[1] At the time, CitiPoint was an "unincorporated enterprise," organized by Chojnacki, that appeared to be a real-estate investment firm. (*Id.* at ¶ 16). Later, on December 28, 2022, CitiPoint reorganized as Citypoint Illinois, LLC, which is owned and controlled by non-party Citypoint Group, Inc. (*Id.*)

3

Chojnacki-affiliated Mainstreet Property Management's ("Mainstreet") property-management service, Mikosz proposed, Hui could expect "substantial cash flow." (*Id.* at ¶ 89). As with Flip Chicago, led Hui to believe that they were agents for Chase RE, an affiliate of CitiPoint, and "the transactions would be safely negotiated and consummated under the auspices of Chase Real Estate." (*Id.* at ¶ 85). At the time, the CitiPoint website was "a virtual reflection" of Chase RE's website. (*Id.* at ¶ 86; *see* Dkts. 1-3, 1-8).

Chojnacki sent Hui information about two multi-unit properties that Hui later purchased: 4104-08 Grand Boulevard and 1717 East Columbus Drive in East Chicago, Illinois (the "Grand Columbus Properties"). (Dkt. 1 ¶¶ 82, 90; Dkt. 1-9). Chojnacki sent Hui a link to a CitiPoint prospectus showing a positive cash flow for the Grand Columbus Properties with all units rented, except for one unit under renovation. (Dkt. 1 ¶ 90; Dkt. 1-9). The prospectus further detailed that an investor would receive "even higher cash flow" by hiring Mainstreet to manage the Grand Columbus Properties. (Dkt. 1 ¶ 90). Although the market value for the Grand Columbus Properties was $776,926, according to the prospectus, Hui could purchase them for $615,000. (*Id.* at ¶¶ 91–92). On September 13, 2021, Defendant Rebecca Irwin corroborated the prospectus by emailing Hui financial documents, including a rent roll and an income statement, to verify the rental cash flow. (*Id.* at ¶¶ 101–04; Dkt. 1-11). Defendants redacted the income statement's heading to conceal its author—Mainstreet. (Dkt. 1 ¶¶ 105–06). Based on Chojnacki's and Mikosz's representations, Hui agreed to purchase the Grand Columbus Properties for $615,000. (*Id.* at ¶¶ 92, 98; Dkt. 1-10).

Unbeknownst to Hui, Defendants sold him the Grand Columbus Properties after buying them for $460,000 through Defendant Grand Columbus EC, LLC ("Grand Columbus")—managed and owned by Defendant Illinois Assets LLC, which is owned and controlled by Chojnacki and Defendant Robert Rixer. (*Id.* at ¶¶ 5–6, 93, 112). Throughout the dealings with Hui, Irwin acted

on behalf of Grand Columbus and Defendant Midwest Title and Closing Services LLC ("Midwest Title"). (*Id.* at ¶ 126). Through Midwest Title, Irwin provided "registered agent services to the various puppet entities"; she housed "various legal operations" relating to the entities and deals; and she charged Hui a fee for "closing coordination." (*Id.* at ¶ 127). Midwest Title—owned and controlled by Irwin and nonparty XYZABC, Inc., of which Irwin is the president—shares office space with Irwin, Chojnacki, Mikosz, Mainstreet, and Defendant EJ Investment Group Inc. ("EJ Investment"), which owns and controls Mainstreet Management. (*Id.* at ¶¶ 11, 14, 18). EJ Investment received a referral fee of $18,450. (*Id.* at ¶ 114).

After taking ownership, Hui discovered there was no "mom and pop" seller. (*Id.* at ¶ 112). Nor was the $615,00 purchase price a "bargain," since Defendants bought the Great Columbus Properties for $460,000. (*Id.* at ¶¶ 92–93). The rent roll and income statement were falsified: the buildings had several vacant and uninhabitable units and tenants facing eviction or in arrears. (*Id.* at ¶¶ 99, 104, 120). Hui also learned that the Grand Columbus Properties had numerous undisclosed building-code violations. (*Id.* at ¶¶ 118, 121). Defendants had failed to comply with Chicago's real-estate transfer inspection and approval requirements, and as a result, Hui received fines and citations. (*Id.* at ¶ 123). Despite these issues, Defendants, through Mainstreet, have charged Hui for unexplained costs and withheld any funds that tenants have paid. (*Id.* at ¶ 124). Defendants have tried to "repeat the scam" by offering Hui additional properties. (*Id.* at ¶ 131). Defendants have allegedly scammed at least nine other investors like Hui. (*Id.* at ¶¶ 132–33).

C.  **The Present Action**

Hui filed this suit in May 2023. (Dkt. 1).[2] In Count I of the Complaint, Hui alleges violations of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C.

---

[2] This is one of eleven related actions proceeding before this Court. *See* Amended Complaint, *Malik v. Prairie Raynor LLC*, No. 23-cv-01182 (N.D. Ill. Mar. 2, 2023); Complaint, *Shankar v. Fairview Ave. Props. LLC*, No. 23-cv-01469

§§ 1962(c), (d). (*Id.* at ¶¶ 134–55). Count II is a common-law fraud claim against Mikosz, Chojnacki, and Irwin. (*Id.* at ¶¶ 156–62). Count III alleges Mikosz, Chojnacki, Irwin, and Kathleen Long, who is not a party, violated the Illinois Consumer Fraud and Deceptive Business Practices Act (ICFA), 815 ILCS 505/1 *et seq*. (*Id.* at ¶¶ 163–69). Count IV alleges Mikosz, Chojnacki, and Chase RE violated the Illinois Real Estate License Act (IRELA), 225 ILCS 454/1 *et seq*. (*Id.* at ¶¶ 170–76). Count V brings a negligent-misrepresentation claim against Mikosz, Chojnacki, Irwin, and Long—again, not a party. (*Id.* at ¶¶ 117–83). Count VI brings a breach-of-contract claim against Grand Columbus, alleging that they breached their contractual duty to provide an accurate rent roll. (*Id.* at ¶¶ 184–91). Count VII brings another breach-of-contract claim against a non-party, Prairie Raynor, LLC, alleging that the contract with Hui falsely represented that the seller was not aware of building-code violations. (*Id.* at ¶¶ 192–97). Last, Count VIII brings an unjust-enrichment claim against all Defendants. (*Id.* at ¶¶ 198–202). Chase RE, joined by the remaining Defendants, moves to dismiss the Complaint for failure to state a claim. (Dkt. 30; *see also* Dkts. 32–36).

## LEGAL STANDARD

To survive a 12(b)(6) motion to dismiss for failure to state a claim, the complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." *Russell v. Zimmer, Inc.*, 82 F.4th 564, 570 (7th Cir. 2023) (quoting Fed. R. Civ. P. 8(a)(2)). Thus, "a plaintiff must allege 'enough facts to state a claim that is plausible on its face.'" *Allen v. Brown Advisory, LLC*, 41 F.4th 843, 850 (7th Cir. 2022) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that

---

(N.D. Ill. Mar. 9, 2023); Complaint, *Abbas v. Mikosz*, No. 23-cv-01691 (N.D. Ill. Mar. 17, 2023); Complaint, *Sor v. TCF Nat'l Holdings, Inc.*, No. 23-cv-02401 (N.D. Ill. Apr. 18, 2023); Complaint, *Chen v. Chojnacki*, No. 23-cv-02520 (N.D. Ill. Apr. 21, 2023); Complaint, *Michel v. Chojnacki*, No. 23-cv-02546 (N.D. Ill. Apr. 24, 2023); Complaint, *Said v. Chojnacki*, No. 23-cv-02858 (N.D. Ill. May 5, 2023); Amended Complaint, *Haynes v. Fairview Ave. Props. LLC*, No 23-cv-01596 (N.D. Ill. May 16, 2023); Complaint, *Stafford v. Chojnacki*, No. 23-cv-03173 (N.D. Ill. May 19, 2023); Complaint, *Fernandez v. Chojnacki*, No. 23-cv-04406 (N.D. Ill. July 7, 2023).

6

allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Ashcroft v. Iqbal*, 566 U.S. 662, 678 (2009)). The Court accepts the well-pleaded factual allegations in the plaintiff's complaint as true, "drawing all reasonable inferences in his favor." *Id.* (citing *W. Bend Mut. Ins. Co. v. Schumacher*, 844 F.3d 670, 675 (7th Cir. 2016)).

For claims sounding in fraud, Federal Rule of Civil Procedure 9(b) requires plaintiffs to "state with particularly the circumstances constituting fraud." Fed. R. Civ. P. 9(b). Thus, a plaintiff must "describe the 'who, what, when, where, and how' of the fraud—'the first paragraph of any newspaper story.'" *United States ex rel. Presser v. Acacia Mental Health Clinic, LLC*, 836 F.3d 770, 776 (7th Cir. 2016) (quoting *United States ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 853 (7th Cir. 2009)).

## DISCUSSION

**I.      Racketeer Influenced and Corrupt Organizations Act (RICO) (Count I)**

In Count I, Hui alleges that Chojnacki, Mikosz, Grand Columbus, and Citypoint Illinois (collectively, "the § 1962(c) Defendants") violated § 1962(c), (Dkt. 1 ¶¶ 134–45), while the remaining Defendants 1st Midwest, Irwin, Midwest Title, EJ Investment, Chase RE, Mainstreet, Murphy, Rixer, and Illinois Assets (collectively, "the § 1962(d) Defendants") violated § 1962(d), (*id.* at ¶¶ 146–51). Defendants challenge Hui's claims under both subsections. Before diving into the RICO allegations, it is worth noting that the complaints in the ten related cases pending before this Court—all describing similar schemes to defraud other plaintiffs by the same or similar defendants[3]—give Hui's claims a plausibility boost. *See Pirelli Armstrong Tire Corp. Retiree Med.*

---

[3] *See* Amended Complaint, *Malik*, No. 23-cv-01182; Complaint, *Shankar*, No. 23-cv-01469; Complaint, *Sor*, No. 23-cv-02401; Complaint, *Chen*, No. 23-cv-02520; Complaint, *Michel*, No. 23-cv-02546; Complaint, *Said*, No. 23-cv-02858; Amended Complaint, *Haynes*, No. 23-cv-01596; Complaint, *Stafford*, No. 23-cv-03173; Complaint, *Abbas*, No. 23-cv-01691; Complaint, *Fernandez*, No. 23-cv-04406.

7

*Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 443 (7th Cir. 2011) ("It is appropriate to accord limited corroborative weight to allegations in another's lawsuit.").

### A.  Section 1962(c)

Under § 1962(c), it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). Section 1964(c) "empowers private parties to bring lawsuits against those engaged in racketeering activity when that activity has caused them harm." *Armada (Singapore) PTE Ltd. v. Amcol Int'l Corp.*, 885 F.3d 1090, 1093 (7th Cir. 2018) (citing *Rotella v. Wood*, 528 U.S. 549, 557 (2000)). To state a claim under § 1962(c), a plaintiff must allege: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001); *accord Sabrina Roppo v. Travelers Com. Ins. Co.*, 869 F.3d 568, 587–88 (7th Cir. 2017).

#### 1.  Conduct of an Enterprise

A plaintiff's first step under § 1962(c) is to identify an "enterprise." *United Food & Com. Workers Unions & Emps. Midwest Health Benefits Fund v. Walgreen Co.*, 719 F.3d 849, 853 (7th Cir. 2013) (citation omitted). An "enterprise" means "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4); *see also Walgreen*, 719 F.3d at 853 (observing that the statutory definition of "enterprise" is construed broadly). An "association-in-fact" enterprise has "three structural features: [1] a purpose, [2] relationships among those associated with the enterprise; and [3] longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946 (2009); *Sabrina*, 869 F.3d at 588. Put simply,

this type of enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct." *Boyle*, 556 U.S. at 946 (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)).

Separate from the RICO enterprise, the plaintiff must point to a "person"—that is, the defendant. *Walgreen*, 719 F.3d at 853 (citing *Cedric Kushner*, 533 U.S. at 161); *see also Baker v. IBP, Inc.*, 357 F.3d 685, 692 (7th Cir. 2004) ("Without a difference between the defendant and the 'enterprise' there can be no violation of RICO."). "[T]hat 'person' must have conducted or participated in the conduct of the *enterprise's* affairs, not just its own affairs." *Walgreen*, 719 F.3d at 854 (quoting *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993)) (cleaned up). In this context, conduct refers to a defendant's operation or management of the enterprise. *See Sabrina*, 869 F.3d at 589 (citing *Reves*, 507 U.S. at 179).

Here, Hui has sufficiently alleged two association-in-fact enterprises with purpose, relationships, and longevity. Hui alleges that the § 1962(c) Defendants—which no one disputes are RICO "persons"—"were associated in fact" as the CitiPoint Enterprise and the Flip Chicago Enterprise. (*See* Dkt. 1 ¶¶ 26, 80, 136; Dkt. 38 at 4).[4] The purpose behind each Enterprise differs slightly; yet, both allegedly defrauded investors through similar schemes. The CitiPoint Enterprise's "primary purpose . . . was to lure and then fleece unsuspecting real estate investors" for financial gain. (Dkt. 1 ¶ 138). And the Flip Chicago Enterprise's purpose was to sell "falsely labeled REO properties to out-of-state investors with the intention of appropriating the promised REO discount." (Dkt. 38 at 4). Put simply, the Enterprises operated on both sides of real-estate

---

[4] Hui supplemented his allegations through his response to Defendants' motion to dismiss. (Dkt. 38 at 2–4). In opposing dismissal, Hui is free to "elaborate on his factual allegations so long as the new allegations are consistent with the pleadings." *See Peterson v. Wexford Health Sources, Inc.*, 986 F.3d 746, 752 n.2 (7th Cir. 2021) (quoting *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012)).

transactions to profit at the expense of investors. Mikosz and Chojnacki, members of both Enterprises, worked together from their shared office, doing business as CitiPoint (later, as Citypoint Illinois) and Flip Chicago. After drawing Hui in with promises of too-good-to-be-true investment opportunities, Mikosz and Chojnacki purported to represent Hui as real-estate brokers in his purchase of the Properties to rent and flip, and they encouraged Hui to trust their numerous and repeated misstatements about the Properties' condition, owners, and profitability. While Hui agreed to buy the Elmwood Park and Grand Columbus Properties for $850,000 in total, Chojnacki, Rixer, and Murphy, through Grand Columbus, 1st Midwest and Illinois Assets, bought the Properties for $670,000 and resold them to Hui at a $180,000 profit.

The sophisticated coordination and relationships among Defendants on both sides of Hui's purchases reflect "an unusual degree of economic interdependence" that helps nudge the existence of the CitiPoint and Flip Chicago Enterprises across the plausibility threshold. *See Bible v. U.S. Aid Funds, Inc.*, 799 F.3d 633, 656 (7th Cir. 2015); *see also, e.g.*, *Jay E. Hayden Found. v. First Neighbor Bank, N.A.*, 610 F.3d 382, 384, 388–89 (7th Cir. 2010) (holding that the plaintiff adequately alleged an enterprise by pointing to a coordinated fraudulent scheme); *cf. Walgreen*, 719 F.3d at 855 ("RICO does not penalize parallel, uncoordinated fraud." (citing *Boyle*, 556 U.S. at 947 n.4)). Indeed, that coordination appears essential to the success of the alleged schemes. Rather than "a run-of-the-mill commercial relationship where each entity acts in its individual capacity to pursue its individual self-interest," therefore, the CitiPoint and Flip Chicago Enterprises look more like "truly joint enterprise[s] where each individual entity acts in concert with the others to pursue a common interest." *See Bible*, 799 F.3d at 655–56. Moreover, the alleged CitiPoint and Flip Chicago Enterprises lasted long enough for their members to pursue the enterprises' purpose of attracting investors and profiting from their purchases. *See Walgreen*,

719 F.3d at 853 (citing *Boyle*, 556 U.S. at 946). Regarding the Flip Chicago Enterprise, after Hui closed on the Elmwood Park Property, Defendants continued to bill Hui for shoddy renovations. And for the CitiPoint Enterprise, after Hui closed on the Grand Columbus Property, Defendants continued to offer him additional properties and, through Mainstreet, charged him for unidentified costs and withheld tenant funds.

Defendants contend that Hui has failed to plead a distinct enterprise because there is "complete identity between the alleged 'persons' and the alleged members of the 'enterprise[s].'" (Dkt. 31 at 7); *see Baker*, 357 F.3d at 692. This argument rests on the mistaken view that an enterprise's members cannot be named as defendants. Of course, an entity cannot be liable under RICO for "operat[ing] *itself* unlawfully." *See Baker*, 357 F.3d at 691–92; *Walgreen*, 719 F.3d at 854; *see also Haroco, Inc. v. Am. Nat'l Bank & Tr. Co. of Chi.*, 747 F.2d 384, 402 (7th Cir. 1984), *aff'd on other grounds*, 473 U.S. 606 (1985). Yet, a plaintiff may state a RICO claim against each member of an association-in-fact enterprise. *See Haroco*, 747 F.2d at 401 ("Where persons associate 'in fact' for criminal purposes . . . each person may be held liable under RICO for his, her, or its participation in conducting the affairs of the association in fact through a pattern of racketeering activity.").

To satisfy RICO's distinctness requirement, the enterprise can "be either formally (as when there is incorporation) or practically (as when there are other people besides the proprietor working in the organization)" separate from the "person." *McCullough v. Suter*, 757 F.2d 142, 144 (7th Cir. 1985); *see also Cedric Kushner*, 533 U.S. at 162–63 ("The corporate owner/employee, a natural person is distinct from the corporation itself, a legally different entity with different rights and responsibilities due to its different legal status. And we can find nothing in the statute that requires more 'separateness' than that." (citing *McCullough*, 757 F.2d at 144)). Hui's allegations suggest

that the CitiPoint and Flip Chicago Enterprises are distinct from each of their respective § 1962(c) Defendants who served as members. Unlike the Enterprises' members—who are "persons," capable of holding property—the CitiPoint and Flip Chicago Enterprises are networks of individuals and entities, associated in fact, and thus unable to "hold any interest in property or even be brought into court." *See Haroco*, 747 F.2d at 401. Accordingly, Hui has alleged the existence of two distinct enterprises.

Hui has also plausibly alleged that the § 1962(c) Defendants participated in operating or managing the CitiPoint's and Flip Chicago's Enterprises affairs. *See Sabrina*, 869 F.3d at 589 ("[T]o satisfy the 'conduct' element, a plaintiff must allege that the defendant participated in the operation or management of the enterprise itself, and that the defendant played some part in directing the enterprise's affairs." (quoting *Goren v. New Vision Int'l, Inc.*, 156 F.3d 721, 727–28 (7th Cir. 1998))) (cleaned up); *Reves*, 507 U.S. at 179; *see also Bible*, 799 F.3d at 657. The precise hierarchies of the CitiPoint or Flip Chicago Enterprises may be unclear. Yet, Hui has alleged that Chojnacki and Mikosz attracted and purported to represent unwitting investors in buying properties to rent or flip while Chojnacki, Murphy, and Rixer, through Grand Columbus and 1st Midwest, purchased and resold properties to those investors. These allegations permit a reasonable inference that the § 1962(c) Defendants held leadership roles and took part in directing the enterprises.

### 2. Pattern of Racketeering Activity

A pattern of racketeering activity requires the completion of at least two predicate acts within ten years. *Bible*, 799 F.3d at 659; 18 U.S.C. § 1961(5). The two violations "must exhibit continuity plus relationship. Related predicate acts have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing

12

characteristics and are not isolated events." *Sabrina*, 869 F.3d at 589 (quoting *Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc.*, 831 F.3d 815, 828 (7th Cir. 2016)) (cleaned up); *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989). "Continuity is 'centrally a temporal concept.'" *Empress*, 831 F.3d at 828 (quoting *H.J.*, 492 U.S. at 242). Analytically, "'[c]ontinuity' is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *Id.* (quoting *H.J.*, 492 U.S. at 241).

While Defendants do not challenge Hui's satisfaction of the relationship-plus-continuity test, they argue that Hui has failed to adequately plead predicate acts. (Dkt. 31 at 7–10). As predicate acts, Hui alleges mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343. (Dkt. 1 ¶¶ 141–42; Dkt. 38 at 11). "The elements of mail fraud are: (1) the defendant's participation in a scheme to defraud; (2) defendant's commission of the act with intent to defraud; and (3) use of the mails in furtherance of the fraudulent scheme." *Bible*, 799 F.3d at 657 (quoting *Williams v. Aztar Ind. Gaming Corp.*, 351 F.3d 294, 298–99 (7th Cir. 2003)) (cleaned up); 18 U.S.C. § 1341. Wire fraud has the same elements, except that the defendant must use interstate wires instead of mail to further the scheme. *Bible*, 799 F.3d at 657 (citing *United States v. Green*, 648 F.3d 569, 577–78 (7th Cir. 2011)); 18 U.S.C. § 1343.

Hui's allegations of mail and wire fraud are subject to Rule 9(b)'s particularity requirement. *See Bible*, 799 F.3d at 658; Fed. R. Civ. P. 9(b). At a minimum, therefore, Hui must "describe the two predicate acts of fraud with some specificity and state the time, place, and content of the alleged false representations, the method by which the misrepresentations were communicated, and the identities of the parties to those misrepresentations." *Bible*, 799 F.3d at 658 (quoting *Slaney v. Int'l Amateur Athletic Fed'n*, 244 F.3d 580, 597 (7th Cir. 2001)). Yet, Rule

13

9(b) does not demand "form for form's sake": "although 'plaintiffs are not absolutely required to plead the specific date, place, or time of the fraudulent acts,' they still must 'use some alternative means of injecting precision and some measure of substantiation into their allegations of fraud.'" *Pirelli*, 631 F.3d at 442 (internal quotation omitted). The requisite level of detail may vary from case to case. *Id.* (citing *Emery v. Am. Gen. Fin., Inc.*, 134 F.3d 1321, 1324 (7th Cir. 1998)). Since "fair notice is the 'most basic consideration underlying Rule 9(b),' in a case involving multiple defendants, 'the complaint should inform each defendant of the nature of his alleged participation in the fraud.'" *Rocha v. Rudd*, 826 F.3d 905, 911 (7th Cir. 2016) (quoting *Vicom, Inc. v. Harbridge Merch. Servs.*, 20 F.3d 771, 777–78 (7th Cir. 1994)).

Starting with the Flip Chicago Enterprise, Hui alleges that Defendants placed advertisements on the internet to induce investors to participate in REO real estate opportunities. (*Id.* at ¶ 19). Yet, Defendants intended to appropriate the "REO discount" and then resell those properties at inflated prices. (Dkt. 38 at 4). While some of these allegations lump Defendants together, others describe the "who, what, when, where, and how" of the fraud. To wit, in the fall of 2020, Mikosz replied to Hui's response to an internet advertisement for Flip Chicago. (*Id.* at ¶¶ 19–21). Through the text and phone conversations that followed, Mikosz drew Hui into the Flip Chicago scheme. (*Id.* at ¶ 21). Mikosz invited Hui to meet Chojnacki and she represented that they were real-estate brokers who would represent Hui, helping him buy, renovate, and flip REO properties at discounted prices. (*Id.* at ¶¶ 22, 27, 29–30, 44). On February 22, 2021, Mikosz emailed Hui about the Elmwood Park Property, describing it as a "foreclosure." (Dkt. 1 ¶¶ 63–65; Dkt. 1-6). Hui alleges Mikosz and Chojnacki made these false statements with intent to defraud him. (*Id.* at ¶¶ 33–37, 40–43); *see Bible*, 799 F.3d at 658 (observing that fraudulent intent "may be alleged generally" (citing Fed. R. Civ. P. 9(b))). Believing in the Defendants, Hui closed on the

14

Elmwood Park Property on May 5, 2021. (Dkt. 1 ¶ 69). In truth, there was no foreclosure. (*Id.* at ¶ 67). Murphy, Chojnacki's affiliate, used his company 1st Midwest to purchase the Elmwood Park Property from a private party who owned it through a land trust. (*Id.*) Nor was there any "REO discount" since 1st Midwest purchased the property for $210,000 and sold it to Abbas for $235,000. (*Id.* at ¶¶ 67–68).

Hui alleges that Defendants engaged in a similar fraudulent scheme through the CitiPoint Enterprise. (*Id.* at ¶ 81). Defendants offered Hui the opportunity to invest in "directly sourced" real-estate opportunities. (*Id.* at ¶ 84). Yet, Defendants "actually intended to sell the duped investor their own significantly marked-up property." (*Id.* at ¶ 142(b)). Mikosz and Chojnacki introduced CitiPoint (now Citypoint Illinois) as a source to connect investors with undervalued, underperforming properties. (*Id.* at ¶ 83). They told Hui that he could buy buildings from retiring "mom and pop landlords." (*Id.* at ¶ 87). Chojnacki then emailed Hui a link to a prospectus showing that the Grand Columbus Property had a "positive cash flow" and was "completely rented." (*Id.* at ¶ 90). To bolster these promises, on September 13, 2021, Irwin, as an agent for Grand Columbus, emailed Hui a falsified rent roll and income statement for the Grand Columbus Property. (*Id.* at ¶¶ 102–03). Again, Hui alleges Defendants made these false statements with intent to defraud him. (*Id.* at ¶¶ 94–100); *see Bible*, 799 F.3d at 658. Believing Chojnacki and Mikosz, Hui closed on the property on November 28, 2021. (Dkt. 1 ¶ 111). But in truth, the seller was Grand Columbus, owned and controlled by Chojnacki and Rixer through Illinois Assets. (*Id.* at ¶¶ 5–6, 97). The buildings had several vacant and uninhabitable units. (*Id.* at ¶¶ 99, 104, 120). And the purchase price was no "bargain" considering Grand Columbus bought the property for $460,000 and resold it to Hui for $615,000. (*Id.* at ¶¶ 93, 111).

In sum, Hui's well-pleaded allegations add up to at least two plausible instances of wire fraud—a sufficient pattern of racketeering activity—for each enterprise. *See Empress*, 831 F.3d at 827 ("Each use of the wires can be an individual count of wire fraud and an individual RICO predicate for the purpose of establishing two predicate acts.").[5] Accordingly, Hui's § 1962(c) claim survives.

### B. Section 1962(d)

Section 1962(d) makes it "unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." 18 U.S.C. § 1962(d). To state a claim under § 1962(d), a plaintiff "must allege that the defendant (1) agreed to maintain an interest in or control of an enterprise, or to participate in an enterprise's affairs, (2) through a pattern of racketeering activity, and (3) that the defendant agreed that some member of the conspiracy (not necessarily the defendant herself) would commit at least two predicate acts in furtherance of those goals." *Domanus v. Locke Lord LLP*, 847 F.3d 469, 479 (7th Cir. 2017) (citing *DeGuelle v. Camilli*, 664 F.3d 192, 204 (7th Cir. 2011)). Subsection (d)'s concern is "the agreement to participate in an endeavor, which if completed would violate a substantive provision of the Act." *Id.* (citing *Goren*, 847 F.3d at 731–32); *see also Empress*, 831 F.3d at 822–23 ("As with any conspiracy, a RICO conspirator 'must intend to further an endeavor which, if completed, would satisfy all elements of a substantive criminal offense, but it suffices that he would adopt the goal of furthering or facilitating the criminal endeavor.'" (quoting *Salinas v. United States*, 522 U.S. 52, 65 (1997))); *Domanus*, 847 F.3d at 479. Here, that substantive provision is subsection (c).

Defendants argue that Hui's § 1962(d) claim fails because his § 1962(c) claim is deficient. (Dkt. 31 at 6–7); *see, e.g.*, *Patel v. Mahajan*, 2012 WL 3234397, at *5 (N.D. Ill. Aug. 6, 2012)

---

[5] Hui alleges that "[t]he CitiPoint Enterprise conducted its racketeering activity, in part, . . . through the mailing of checks." (*Id.* at ¶ 140).

("When a § 1962(c) claim fails, a § 1962(d) claim premised on the same facts fails as well." (collecting cases)). Yet, Hui has stated a claim under § 1962(c). Defendants raise no other arguments against Hui's § 1962(d) claim, and the Court declines to invent arguments on their behalf. *See Hicks v. Hepp*, 871 F.3d 513, 531 (7th Cir. 2017) ("Neither the district court nor this court are obliged to research and construct legal arguments for parties, especially when they are represented by counsel." (quoting *Nelson v. Napolitano*, 657 F.3d 586, 590 (7th Cir. 2011))). Thus, Count I may proceed in its entirety.

**II.     State-Law Claims (Counts II–VIII)**

In Hui's remaining claims under state law, he alleges common-law fraud (Count II); violation of the ICFA (Count III); violation of the IRELA (Count IV); negligent misrepresentation (Count V); breach of contract (Counts VI & VII); and unjust enrichment (Count VIII). (Dkt. 1 ¶¶ 156–202). With scant citations to caselaw, Defendants contend that Counts II through V sound in fraud, and these claims fail to meet Rule 9(b)'s heightened pleading requirement "for the same reasons" as Hui's RICO claim. (Dkt. 31 at 10–13). Along similar lines, Defendants point out that Hui's unjust-enrichment claim is "tied to the fate" of his other claims. (*Id.* at 12–13 (quoting *Vanzant v. Hill's Pet Nutrition*, 934 F.3d 730, 740 (7th Cir. 2019))); *see Benson v. Fannie May Confections Brands, Inc.*, 944 F.3d 639, 648 (7th Cir. 2019) ("Under Illinois law, there is no stand-alone claim for unjust enrichment."). Again, Hui has stated a RICO claim, and the Court need not invent arguments for Defendants. *See Hicks*, 871 F.3d at 531. By failing to develop further arguments on the sufficiency of Hui's state-law claims, Defendants have waived any arguments they might have made. *See Wernstein v. Schwartz*, 422 F.3d 476, 477 n.1 (7th Cir. 2005); *Bradley v. Village of University Park*, 59 F.4th 887, 897 (7th Cir. 2023).

17

Finally, no Defendant has challenged Hui's claims against nonparties Long, in Counts III and IV, and Prairie Raynor, in Count VII. These Counts contain allegations suggesting Plaintiffs may have contemplated bringing claims against Prairie Raynor and Long. Yet, Prairie Raynor and Long are not named defendants, and there is no indication that Plaintiffs served them in this action. Accordingly, the Court *sua sponte* dismisses the claims against those nonparties without prejudice. *See, e.g.*, *Carroll v. Diederich*, 2005 WL 3180097, at *9 (N.D. Ill. Nov. 28, 2005) (citing Fed. R. Civ. P. 4(m)).

## CONCLUSION

For the reasons above, Defendants' Motion to Dismiss [30] is denied in its entirety. On its own motion, the Court dismisses Counts III and IV in part—only as against nonparty Long—and Count VII against nonparty Prairie Raynor without prejudice. Hui's claims in Counts I–VI and VIII may otherwise move forward consistent with this Opinion.

_____
Virginia M. Kendall
United States District Judge

Date: December 6, 2023