**THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| RANDY HUI, | ) | |
| | ) | |
| *Plaintiff*, | ) | No. 23 C 3430 |
| v. | ) | |
| | ) | Chief Judge Virginia M. Kendall |
| MARCIN CHOJNACKI, *et al*., | ) | |
| | ) | |
| *Defendants*. | ) | |

**MEMORANDUM OPINION & ORDER**

Plaintiff Randy Hui brought a complaint alleging violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1962(c), (d), and various state-law claims. (Dkt. 2). It is one of 15[1] related cases, all in front of this Court, that Plaintiff's attorneys have brought alleging that various overlapping Defendants engaged in a fraudulent real-estate investment scheme. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1964(c).

Over the course of the litigation, numerous defendants settled with Plaintiff. Nonetheless, two separate sets of Defendants filed motions for summary judgment against Said: Defendants Kendall Murphy, 1st Midwest Financial, Inc. ("Murphy Defendants") (Dkt. 206) and Defendant Marcin Chojnacki along with related entities (Chojnacki Defendants) (Dkt. 208). Unlike in many of the other related cases, Hui's Complaint does not name Kathleen Long and certain related entities as a Defendant (Dkt. 1); thus, references to Long are included only as far as they are relevant to the Motions.

[1] There were as many as 16 related cases, but one, *Ascot Specialty Insurance Company, A Rhode Island Corporation v. Midwest Title & Closing Services LLC et al*, 1:24-cv-05216, settled and closed on December 4, 2025.

For the below reasons, the Chojnacki Defendants' Motion for Summary Judgment (Dkt. 206) and the Murphy Defendants' Motion (Dkt. 208) are granted in part and denied in part. The Motions are granted with regard to Plaintiff's attempt to proceed under 18 U.S.C. § 1964 on a theory of speculative profit loss; they are otherwise denied as to the RICO claims, which remain in the case in accordance with the analysis herein. The Court also grants the Murphy Defendants' Motion on Count VIII (thus granting that Motion in full). The Court also grants the Chojnacki Defendants' Motion with regard to common-law fraud (Count II); violation of the IRELA (Count IV); and negligent misrepresentation (Count V); it denies the motion as to violation of the ICFA (Count III) and the follow-on claim of unjust enrichment (specifically for the Chojnacki Defendants) (Count VIII), which remain in the case and will proceed to trial unless the parties can reach a settlement.

## BACKGROUND

Related cases in this litigation have already made clear the shortcomings of the present record. To summarize some of the most pertinent issues discussed therein: Plaintiffs' attorneys regularly inserted entire paragraphs worth of fact into their 56.1 Response entries, routinely provided massive string cites that did not justify the stated assertions, and consistently inserted their legal allegations and conclusory assessments—including entire swaths of their expert reports—as statements of "fact," all of which the Court ignored. On multiple occasions. the Plaintiffs' attorneys cited to the allegations in the Complaint, rather than admissible evidence, in their 56.1 statements; multiple parties inappropriately admitted facts and then proceeded to provide further information in the response. The Defendants, meanwhile, routinely base their 56.1 statements on the plaintiffs' depositions in these cases and then proceed to object to plaintiffs' own citations to those exact same depositions—often the exact same *portion* of the depositions—as

inadmissible hearsay (though this characterization is frequently incorrect under the party-opponent admission exception under Federal Rule of Evidence 801(d)(2)(D)).

As made clear throughout the related cases, this Court has the discretion to deem admitted facts that either side does not expressly admit yet fails to dispute with citations to admissible evidence in the record. *See Dade v. Sherwin–Williams Co.*, 128 F.3d 1135, 1139 (7th Cir. 1997) (referring to L.R. 56.1's predecessor rule, the court affirmed the district court's taking as true uncontroverted facts alleged in the movant's statement and supported by references to the record); *see also Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008) ("It is not the duty of the court to scour the record in search of evidence to defeat a motion for summary judgment; rather, the nonmoving party bears the responsibility of identifying the evidence upon which he relies."). The Court thus proceeds by crediting only those statements that are adequately supported in the record and relevant to the resolution of the Motions. As explicated in the related cases, Defendants' frequent objections to cited emails on authenticity and hearsay grounds are overruled unless indicated otherwise in the text of the Court's analysis. The few other objections relevant to material facts are addressed below, alongside the <u>relevant</u> facts (that are undisputed unless otherwise indicated).

## I. Background

The Court also, at this point, adopts the general background information established as undisputed in the related cases without repopulating the same record with new citations. That includes the following: (Former defendant) Chase Real Estate, LLC, owned and managed by Christian Chase, provided certain services to brokers for a fee, including allowing the brokers to use the www.mychaseagent.com domain and the mychaseagent.com email. Defendant Marcin Chojnacki ("Chojnacki") is a licensed real estate broker and was the designated managing broker

for the Chase RE Roselle branch during the relevant time period. Robert Rixer ("Rixer") was a real estate broker for Chase RE Roselle during the relevant time period. Former Defendant Laurena "Lori" Mikosz also was a real estate broker for Chase RE Roselle during the relevant time period.

Chojnacki and Rixer jointly own Market Equities, Inc., a Delaware Corporation formed in 2022; Market Equities, Inc. is the sole owner of Illinois Assets as well as EJ Investments (since 2022) which in turn owns Mainstreet Property Management. Defendant EJ Investments (EJ) was formed by Chojnacki and Rixer in 2020 and was initially owned by Chojnacki and his then-fiancé Long (who also share children); in 2022, Chojnacki and Rixer's Market Equities, Inc., assumed ownership of EJ. Chojnacki's mother, Iwona, is EJ's bookkeeper. Rixer, Chojnacki and Long are signers on the EJ Investment bank account. Rixer and Chojnacki also co-own Citypoint Illinois LLC and have both been brokers there since 2023; Rixer became the managing broker for Citypoint in 2023. The Chojnacki Defendants dispute that Long herself worked for Citypoint any earlier than April 2025. Rixer and Chojnacki also co-owned the now dissolved Illinois Assets LLC.

Long is involved in this action through her alleged involvement in some of the financial entities that Plaintiff argues make up the Citypoint/Citipoint Enterprise: now dissolved Defendant First National Financial (FNF), now dissolved entity Defendant TCF National Holdings (TCF), and Prairie Raynor. Long was the sole shareholder, officer and director of FNF prior to its dissolution on December 20, 2024; she was also the sole signatory on FNF's bank account. Although Rixer and Chojnacki created TCF, Long was the sole shareholder and officer of TCF via FNF; Long was also the sole signatory on the bank account and sole person who had authority to act on behalf of the bank account for TCF, (which Defendants disputed in some cases but admitted on the *Malik* docket (Dkt. 436 ¶ 16), so the Court considers it admitted. Through this organizational structure, Long was the face of TCF; a design that Plaintiff asserts was to conceal Rixer and

Chojnacki from the public record, whereas the Chojnacki Defendants assert was a decision made for branding purposes.

Former Defendant Rachel Irwin was an employee of Chojnacki's now dissolved Chojnacki Real Estate, Inc. corporation, and then an employee of former Defendant Midwest Title and Closing Services, which she co-owned with Chojnacki. Irwin was also General Counsel for Rixer and Chojnacki's EJ Investments and a shareholder of XYZABC, Inc., a Delaware corporation that she co-owned with Chojnacki. XYZABC, Inc. was the manager of Midwest Title and Closing Services. Via these entities, Irwin communicated with Chojnacki, Rixer, and Long's lenders, organized entities, prepared operating agreements and bylaws, amendments to bylaws and operating agreements, and other legal documents for Chojnacki, Rixer, Long and their entities; Irwin also acted as "Seller's" attorney for Chojnacki, Rixer, Long and their entities.

That leaves the Murphy Defendants. Murphy was the sole shareholder, President, and Director of 1st Midwest Financial, Inc. ("1st Midwest") (prior to its dissolution) and went to school with Chojnacki. Murphy testified that 1st Midwest's business was to hold title to properties for agents. Murphy testified that he had an "unofficial" relationship to hold title for Long, but Chojnacki directed Murphy's 1st Midwest company's wiring of the funds. (Dkt. 224 ¶ 32).

The corporate address initially listed on the Secretary of State's website for 1st Midwest was 1046 Midwest Road, in Northbrook, before being properly corrected to 1046 Midway Road in Northbrook, which the Murphy Defendants contend was a clerical error while Plaintiff argues this was part of a broader scheme on the confusing grounds that "the street name "Midwest" would reinforce the incorrect conclusion that 1st Midwest was a bank."

### II. The Hui Connection

With that, the Court turns to the facts that connect Hui, a California resident, to this complicated web of actors. Hui's real estate investing journey started with a fix-and-flip venture in 2012 in which he broke even; he is a licensed as a California real estate salesperson. (Dkt. 216 ¶¶ 9–10). In September of 2020, Hui discovered Flip Chicago through an online search for flip opportunities and subsequently filled out an inquiry form on their website. (Dkt. 216 ¶ 11). On September 4, 2020, Lori Mikosz emailed Hui introducing herself and began a discussion about Hui's real estate investment goals. (Dkt. 216 ¶ 11). At that time, Hui was mainly focused on single-family fix-and-flips and he did want to get into multi-family investment opportunities. (Dkt. 216 ¶ 11). As a result of this conversation, Mikosz forwarded him a fix and flip property located at 541 Cass St., Crete, Illinois (the "Cass" property). (Dkt. 216 ¶ 12). Hui testified that Mikosz told him he was buying from a bank. (Dkt. 216 ¶ 14). This would be the first of three purchases with Flip Chicago, and first of five acquisitions with Chase Real Estate overall.

On or around October 19, 2020, Hui purchased the Cass property for a purchase price of $106,000, with Mikosz representing him as his designated agent. (Dkt. 216 ¶ 13). Ultimately, Hui purchased the Cass property in cash never having had it appraised or inspected; Defendants charge that Hui never visited the property in person, either, which Plaintiffs dispute as unsupported by testimony in which Hui said the extent of his due diligence was asking Mikosz for photos and videos and looking at comparable properties online. (Dkt. 216 ¶ 15). Nonetheless, in a separate portion of his deposition, Hui said "I've never seen the property myself." (Hui Dep. 146:13-146:16). The estimated ARV (after renovation value) was $200,000. (Dkt. 216 ¶ 15).

Mikosz connected Hui with CK construction, a contractor that Chase used frequently, to assist him with the renovation of the Cass property and Hui chose to have Mikosz act as the project manager and supervise the renovation. (Dkt. 216 ¶ 16). The renovation moved fairly quickly,

ending by mid-December of 2020; at that time, Mikosz assisted Hui with the process of listing the property on the market. (Dkt. 216 ¶ 17). The renovation cost approximately $47,000. (*Id.*)

While renovating the Cass property, mold spots were discovered on the ceiling, however Hui testified that he decided against expending the cost of fixing it as part of his flip because "if that is something that is a concern for that particular buyer or inspector, then they would always bring it up." (Dkt. 216 ¶ 18; Hui Dep. 145:10-146:16). After an initial sale for $215,000 fell through in January 2021 due to the mold issue, Hui had another offer by February, and he sold the property on April 21, 2021, for $205,000 — $99,000 more than he purchased it for. (Dkt. 216 ¶¶ 19–20). Hui estimated that he put in a total of around 20–25 hours of work into the Cass property. (Dkt. 216 ¶ 21).

Early in 2021, Hui discovered the property located at 8608 McVicker Ave., Burbank, Illinois (the "McVicker" property). (Dkt. 216 ¶ 22). At his deposition, Hui testified that he could not remember whether Mikosz had also sent him the property directly or whether he discovered it in a Chase Real Estate marketing email. (Dkt. 216 ¶ 22). On February 9, 2021, with Mikosz once again represented Hui as his designated agent, Hui signed a purchase agreement for the McVicker property through his LLC, Atticus Investment Group, for $172,000, from First Midwest Financial, Inc. (Dkt. 216 ¶ 23; Dkt. 210, Exhibit I). Hui purchased the McVicker property despite having never seen it in person. (Dkt. 216 ¶ 24). Hui financed this purchase, and as a part of that financing, he had the property appraised. (Dkt. 216 ¶ 24). The appraisal for the property put the value of the McVicker property at $185,500, which was higher than Hui's purchase price. (Dkt. 216 ¶ 26).[2]

[2] As in other cases, Plaintiff contends that the document should not count as an appraisal because it refers to nearby comp properties for its estimates despite the fact that the "sales comparison approach is [often seen as] the most reliable method for appraising the value." *Buchanan Energy (N), LLC v. Lake Bluff Holdings, LLC*, 2017 WL 1232973, at *6 (N.D. Ill. Apr. 4, 2017); nevertheless, the argument that the report should be set aside by a factfinder does not bear on a factual statement about the report's contents.

However, the estimated ARV of $255,000 was lower than he had hoped, which impacted the financing. (Dkt. 216 ¶ 26). As a result, Hui attempted to push for a higher ARV by offering more market comparisons, but ultimately, Hui had to accept the original appraisal value. (Dkt. 216 ¶ 27). While this was happening, 1st Midwest Financial (Murphy) acquired title to McVicker on or around February 25, 2021, for $160,000.00. (Dkt. 224 ¶ 62). Then 1st Midwest sold 8608 McVicker to Hui for $172,000.00; bank records show that on March 5, 2021, Lakeland Title wired to 1st Midwest the net proceeds for Hui's purchase in the amount of $163,796.59. (Dkt. 224 ¶ 62).

For the flip of the McVicker property, Hui skipped having Mikosz act as project manager and rehired CK Construction from the Cass renovation himself, bringing Mikosz back in when it was time to list the property; Hui's renovation budget for McVicker had been around $65,000, but he only ended up needing to pay CK $10,200. (Dkt. 216 ¶¶ 29–30). Hui put the property on the market in June 2021 and then had the exterior painted later in the fall after not seeing a lot of interest on the market, selling it on March 29, 2022, for $310,500 — $138,500 more than he purchased it for; Hui estimated that he put in a total of around 40–50 hours of work into the McVicker property. (Dkt. 216 ¶¶ 31–33).

In early 2021, Mikosz presented to Hui, over email, the property located at 2241 N. 72 Ct., Elmwood Park, Illinois (the "Elmwood Park" property). (Dkt. 216 ¶ 34). Hui signed a purchase agreement for the Elmwood Park property on February 23, 2021, for a purchase price of $235,000, with Mikosz signing as his designated agent. (Dkt. 216 ¶ 34). On March 5, 2021, Hui was informed by Mikosz that the rehab budget for the Elmwood Park property would be $95,000. (Dkt. 216 ¶ 35). Prior to his purchase, Hui sought to have the property appraised, but the first appraiser saw too much potential liability, and so refused to proceed; in order to ensure that it would reach the

maximum possible appraisal value, Hui converted the property from a multi-family building to a single-family home, solely for appraisal purposes. (Dkt. 216 ¶ 36).

With Mikosz once again serving as his designated agent, Hui signed his second agreement to purchase the Elmwood Park property on March 31, 2021, for $235,000. (Dkt. 216 ¶ 37). The reason for the new purchase agreement was that Hui's lender had suggested he get a new contract, since the owner of record had changed. (Dkt. 216 ¶ 37). Hui testified that it was not until after the McVicker property closed that he learned he had been purchasing from an asset manager and not a bank, though the Parties dispute the relevance and extent of his knowledge as well as what was passed along to the lender regarding Elmwood Park; nonetheless, Hui testified that he was catching wind of the non-bank status as well as Defendants' purchase price between contract and close but did not yet identify it as a "red flag" due to his relationship with Chase at the time. (Dkt. 216 ¶¶ 38–39). Hui received an appraisal report that put the "as-is" value at $210,000 and the ARV at $400,000, though Hui testified that he had another ARV projection of $425,000. (Dkt. 216 ¶ 40). Hui closed on the Elmwood Park property on May 5, 2021, without ever having a pre-closing inspection performed. (Dkt. 216 ¶ 41).

Hui did not use CK for the Elmwood Park renovation because they were busy and because they provided Hui with a much higher estimate; instead, Hui went with FB General Contractors also on Mikosz' recommendation. (Dkt. 216 ¶ 42). Once again, she managed the project. (Dkt. 216 ¶ 42). FB Contractors did not do a great job of renovating the property, in Hui's opinion and when he visited the property for the first time in the fall of 2021 and claimed that he was not happy with the condition of the property. (Dkt. 216 ¶ 43). By December of 2021, the renovations were complete and Hui was ready to list the property on the market; with Mikosz' assistance, Hui initially listed the property on December 3, 2021 for $429,500, and within the month, Hui had a

buyer for the property under contract. (Dkt. 216 ¶ 44). On January 31, 2022, Hui sold the Elmwood Park property for $415,000 — $180,000 more than he paid for it. (Dkt. 216 ¶ 45). Hui estimated that he put a total of 30–40 hours of work into the Elmwood Park property. (Dkt. 216 ¶ 45).

On April 22, 2021, Mikosz and Hui discussed a potential deal involving two adjacent East Chicago properties located at 4104–08 Grand Blvd., East Chicago, Indiana; and 1717 E. Columbus Dr., East Chicago, Indiana (together, the "Grand-Columbus" properties). (Dkt. 216 ¶ 46). Hui was initially intrigued at the prospect of buying both properties, but needed to work out the financing since he did not have enough cash on hand for the downpayment. (Dkt. 216 ¶ 47). On April 22, 2021, Mikosz connected him with a commercial lender to begin resolving the issue and began forwarding Hui due diligence items. (Dkt. 216 ¶ 47). On May 11, 2021, Hui signed an "as-is" purchase agreement for the Grand Columbus properties, for a combined purchase price of $615,000. (Dkt. 216 ¶ 48). Again, Mikosz was listed as Hui's designated agent while the seller was listed as "Grand Columbus EC LLC," and the buyer as Hui's LLC, Atticus Investment Group LLC. (Dkt. 216 ¶ 48).

The appraisal process for the Grand-Columbus properties revealed that the combined value of the properties was $750,000, well over Hui's purchase price for the two, which was $615,000. (Dkt. 216 ¶ 53). Hui had both of the properties inspected during the due diligence process. (Dkt. 216 ¶ 51). Separately, Mikosz sent him inspection reports where the client was EJ Investments; there is a dispute whether she told him at that time that EJ owned the properties (as Defendants contend) or whether she told him that Chojnacki and Robert sometimes pay for reports. (Dkt. 216 ¶ 52). Meanwhile, on April 22, Rixer had sent Chojnacki, Mikosz, and another Chase agent an email regarding the inspection of the East Chicago properties in which he wrote: "If an investor asks why a report was done you can tell them the owner was going through a refinance and the

bank requested it OR CitiPoint inspection done on all properties we target which makes it easier for us to sell to investors, especially out of state. Or make up some other bullshit answer, it doesn't matter as long as you have something lined up." (Dkt. 223 ¶ 72).

After some negative conditions in the inspection report, Hui sought concessions, and Mikosz told him that the seller was willing to give him a $30,000 credit on the property, and Hui accepted that offer. (Dkt. 216 ¶ 53). Hui testified that Chojnacki stepped in to assist with due diligence issues on the Grand-Columbus transaction. (Dkt. 216 ¶ 65).

Later, Hui's mortgage broker suggested that he split the transactions into two agreements, so that he could get a better rate, since the Grand property was a commercial multifamily property, so he signed two more purchase agreements. (Dkt. 216 ¶ 54). On October 28, 2021, Hui signed an agreement to purchase the Grand property for $614,900, this time changing the buying entity to a new LLC he created, "Columbus at Grand LLC;" that same day, Hui signed an agreement to purchase the Columbus property. (Dkt. 216 ¶ 55). Hui closed on the Grand-Columbus properties, as a package deal, on December 3, 2021; the purchase price for the properties was $615,000, with a $30,000 credit from the seller. (Dkt. 216 ¶ 56).

Through Mikosz, Hui hired Chojnacki's management company, Mainstreet Property Management, to manage the Grand-Columbus properties but later became unhappy with Mainstreet's management of his properties. (Dkt. 216 ¶ 57). Nonetheless, he stayed with Mainstreet for the Grand-Columbus properties until after he filed suit against Chojnacki, at which point Chojnacki reached out to tell him he had to find a new management company. (Dkt. 216 ¶ 59). Further, Hui believes that the rent rolls he received during the due diligence process were fabricated because, per his testimony, five units across the two buildings' twelve total units were

delinquent two months into his ownership. (Dkt. 216 ¶ 49). In December of 2024, Hui sold the Grand-Columbus properties for $575,000. (Dkt. 216 ¶ 60).

In his real estate investing dealings with Chase Real Estate, Hui invested a total $1,128,000 in the six properties: Cass, McVicker, Elmwood Park, and Grand-Columbus; after the sale of all five properties, Hui walked away with a total of $1,505,000, an aggregate $377,500 return on his investments. (Dkt. 216 ¶ 71). Earlier in his relationship with Chase, Hui recommended the company's services to 5 to 15 people, including plaintiffs in the related cases; Plaintiff contends he did so only prior to learning of ongoing management issues and undisclosed ongoing vacancies. (Dkt. 216 ¶ 61; Dkt. 223 ¶ 65).

Hui now seeks damages for the difference that the Defendants pocketed between purchasing the five properties and then selling them to Hui, as well as $120,000 in back-end damages. (Dkt. 216 ¶ 66; Exhibit MM; Dkt. 232 ¶ 79). For the first three transactions, Hui testified that he thought he was buying directly from a bank named 1st Midwest. When confronted with the fact that he knew for at least three of the five transactions that he was dealing with a wholesaler, he simply stated that it was a "red flag," but also that "at the time, it was not a dealbreaker." (Dkt. 216 ¶ 69). As throughout the related cases, Hui testified that he was at least initially under the impression that he was buying the East Chicago properties from elderly sellers, and believed Mikosz, Chojnacki, and Rixer to be acting in his best interest. (Dkt. 223 ¶ 69). In his deposition, Hui speculated that he might not have purchased the properties had he known who the seller was, and how much they paid for the properties. (Dkt. 216 ¶ 70). As throughout the related cases, Defendants take issue with the alleged back-end damages and allege that he has never provided a detailed explanation or calculation, which Plaintiff disputes without further citation to the record;

Hui also referred Defendants to the same "Master Spreadsheet" that Plaintiff's counsel developed for all the related cases.

## **LEGAL STANDARD**

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see, e.g.*, *Reed v. Columbia St. Mary's Hosp.*, 915 F.3d 473, 485 (7th Cir. 2019). "A dispute of material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Johnson v. Dominguez*, 5 F.4th 818, 824 (7th Cir. 2021). The Court "consider[s] all of the evidence in the record in the light most favorable to the non-moving party." *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018) (citation omitted). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and opposition to the motion for summary judgment." *White v. City of Chi.*, 829 F.3d 837, 841 (7th Cir. 2016) (internal citations omitted). "[S]peculation and conjecture" also cannot defeat a motion for summary judgment. *Cooney v. Casady*, 735 F.3d 514, 519 (7th Cir. 2013). In addition, not all factual disputes will preclude the entry of summary judgment, only those that "could affect the outcome of the suit under governing law." *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001) (citation omitted).

## **DISCUSSION**

After removing the former Defendants, the remaining landscape of Count I is as follows: Malik alleges that Chojnacki himself and most of the Chojnacki Defendants violated § 1962(c), (d),[3] while the Murphy Defendants (as well as Rixer and some of the Chojnacki Defendants)

[33] The Complaint says "18 U.S.C. 1962(c), (d)," for these Defendants, but does not discuss the specific conspiracy aspect; nevertheless, the Complaint clearly indicates where the CK Defendants are only facing allegations under § 1962(d).

violated only § 1962(d). Given the fact that the Chojnacki Defendants filed substantively comparable motions for summary judgment in all of the related cases, the Court assumes familiarity with the analysis laid out in *Malik et al v. Prairie Raynor LLC et al*, 23-cv-1182, and related dockets. Indeed, in this case, the Parties regurgitate their arguments with regard to the RICO claims almost verbatim, so the Court need not re-explicate its analysis on the same: as in *Stafford*, a jury could find that Hui could have obtained at least some of the properties "at the same time in the same place" as Defendants; however, again as in *Stafford*, there can be no "lost investment bargain" theory of RICO injury where the value of property sold is not as high as represented, but is at least what the Plaintiff paid for it. Every single property that Hui had appraised, appraised for more than he paid for it. The one property he chose not to have appraised sold at a profit a year later; indeed, nowhere does Hui attempt to claim the property was not worth what he paid, only that he wanted to pay what Defendants paid. On this record, nothing indicates that Hui did not get the benefit of his bargain, most certainly not his conclusory opinions that he anticipated making more money on the flips. On the state law claims, Plaintiff and the Chojnacki Defendants can go to trial on the scope of damages, but where Congress inputs a statutory requirement on the claim's ability to go forward in the first place, this Court must heed that call.

It is altogether different, however, to allege a RICO violation where the RICO scheme diminishes the actual value of property—in this case, Hui's claims about back-end damages. Defendants contend that the Hui's claims about additional costs, repairs, and delinquent tenants are insufficient and vague, but those arguments speak not to the validity of a claimed injury for RICO standing purposes and instead go to the scope of damages (if any), a query that is best fit for a jury's resolution.

This Court's resolution of the RICO "enterprise" requirement is likewise governed by its previous rulings. Hui, like Malik and Stafford, has developed a record that could conceivably allow a reasonable jury to find that Chojnacki participated in the operation or management of an enterprise to lure in investors through misrepresentations of building ownership and condition even if he was not Plaintiff's point of contact for the operation. Further, a § 1962(c) claim does not require proof that Chojnacki was the exclusive "boss" of the operation so long as a jury could find him reasonably involved in managing it. *See Muskegan Hotels, LLC v. Patel*, 986 F.3d 692, 698 (7th Cir. 2021) ("Lower-rung participants and even third-party outsiders can be liable, provided they play a part in operating or managing the enterprise"). For the Murphy Defendants, facing the § 1962(d) claim, the question is slightly different. Plaintiff need not prove that Murphy operated or managed the enterprise, instead, he would have to show that Murphy, "with knowledge of a conspiracy to violate the RICO statute, agreed to conduct or participate in the affairs of an enterprise through a pattern of racketeering and agreed to the commission of two predicate acts of racketeering." *Id.* at 699.

"[M]ere association with conspirators is not enough to establish an agreement." *See Domanus v. Locke Lord LLP*, 847 F.3d 469, 482 (7th Cir. 2017). Nonetheless, "when the acts performed by the alleged members of the conspiracy are unlikely to have been done alone, the court may infer agreement." *Domanus v. Locke Lord LLP*, 847 F.3d 469, 482 (7th Cir. 2017). On these facts, a jury could find that Murphy, through his 1st Midwest entity's purchases of the subject properties, was sufficiently intertwined in Chojnacki's operations, went beyond basic business interactions and instead met the criteria for § 1962(d).

Of course, it is ultimately possible for a jury to find that the evidence showing that Murphy's involvement in purchasing the properties and selling them to Plaintiff merely indicated

a business record. Yet the argument that NO reasonable jury could find for Plaintiffs on this claim is unpersuasive and cannot be resolved on summary judgment. Plaintiffs' evidence, though shaky at times, could sufficiently tie the Murphy Defendants to the enterprise. The purchasing of properties during Plaintiff's own closing periods, through an entity whose name closely mirrors that of a known financial institution, and the related wiring of cash to other alleged members of the conspiracy could allow a jury to infer the Murphy Defendants knowing participated in the scheme to saddle investors with misrepresented properties in order to make a quick buck.

## I. State-Law Claims (Counts II–VIII)

Next, Chojnacki moves for summary judgment on Said's state law claims for common-law fraud (Count II), violation of the ICFA (Count III); violation of the IRELA (Count IV); and negligent misrepresentation (Count V). (Dkt. 209). Both sets of Defendants moved for summary judgment on the claim for unjust enrichment (Count VIII). Plaintiffs' responses on the issues offer scant case law, instead broadly regurgitating the generalized animating grievances of the amended complaint. Accordingly, most of the state law claims cannot survive this stage in the litigation.

### a. Count II: Common Law Fraud and Count V: Negligent Misrepresentation

"In order to establish fraud under Illinois law, a plaintiff must prove that (1) defendant made a false statement; (2) of material fact; (3) which defendant knew or believed to be false; (4) with the intent to induce plaintiff to act; (5) the plaintiff justifiably relied on the statement; and (6) the plaintiff suffered damage from such reliance." *Houben v. Telular Corp.*, 231 F.3d 1066, 1074 (7th Cir. 2000) (citing *Williams v. Chicago Osteopathic Health Sys.*, 654 N.E.2d 613, 619 (Ill. 1995)).

Negligent misrepresentation has essentially the same elements, except "the defendant need not know that the statement is false. His own carelessness or negligence in ascertaining its truth

will suffice for a cause of action." *Doe v. Dilling*, 228 Ill. 2d 324, 360 (Illinois 2008). "For negligent misrepresentation, a plaintiff must also allege that the defendant owes a duty to the plaintiff to communicate accurate information." *Id.* (citing *Board of Education of City of Chicago v. A, C & S, Inc.,* 546 N.E.2d 580 (Illinois 1989)).

Starting with Count II: the Chojnacki Defendants highlight that there is no evidence of any misrepresentation to Hui from Chojnacki prior to purchase. Plaintiff makes no attempt to dispute this picture, instead generally highlighting that Hui testified that Mikosz and Chojnacki were jointly giving him the impression of things. That is insufficient. *See United States v. 5443 Suffield Terrace, Skokie, Ill.*, 607 F.3d 504, 510 (7th Cir. 2010) (at the summary judgment stage, it is "not the district court's job to sift through the record and make (a party's) case for him"). As courts have often admonished, "summary judgment is the 'put up or shut up' moment in the life of a case," *see, e.g.*, *In re Airadigm Communications, Inc.*, 616 F.3d 642, 657 (7th Cir.2010). It is neither required nor appropriate for the Court to "sift through the record and make [the] case for him." *See 5443 Suffield Terrace*, 607 F.3d at 510. Accordingly, the Chojnacki Defendants are entitled to summary judgment on Count II.

Returning briefly to the negligent misrepresentation claim:[4] Plaintiff did not specifically allege a duty in the Amended Complaint. (Dkt. 1 at 29). Nor does Plaintiff meaningfully address the Defendants' arguments as to negligent misrepresentation in the Response. (Dkt. 28 at 24). Ultimately, though, what dooms Plaintiff's claim here is the same lack of prosecution that impedes the common law fraud claim. After the defendant has made its showing, the non-moving party

[4] While Illinois law generally bars plaintiffs from asserting tort claims such as negligent misrepresentation where they seek to recover only economic losses, it is subject to certain exceptions where "one who is in the business of supplying information for the guidance of others in their business transactions makes negligent representations," an exception that has been applied to real estate brokers. *See Am. Inter-Fid. Corp. v. M.L. Sullivan Ins. Agency, Inc.*, 2016 WL 3940092, at *8 (N.D. Ill. July 21, 2016) (collecting cases).

must come forth with evidence showing what facts are in actual dispute. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986). If the non-moving party fails to do so, summary judgment is proper. *United States v. Selenske*, 882 F.2d 220 (7th Cir.1989). Plaintiffs do not make the requisite arguments here, and the court will not do it for them. *See Little v. Cox's Supermkts.*, 71 F.3d 637, 641 (7th Cir. 1995) (holding that the court "is not required to scour the party's various submissions to piece together appropriate arguments" as it "need not make the lawyer's case").

**b. Count III: ICFA**

In Count III, Plaintiff alleged that Chojnacki violated Illinois's consumer protection statute, the ICFA. *See* 815 ILCS 505/1–505/12. "To prevail on a claim under the ICFA, a plaintiff must plead . . . that the defendant committed a deceptive or unfair act with the intent that others rely on the deception, that the act occurred in the course of trade or commerce, and that it caused actual damages." *Benson v. Fannie May Confections Brands, Inc.*, 944 F.3d 639, 646 (7th Cir. 2019) (quotation marks omitted). "The Illinois Consumer Fraud Act affords broader protection to consumers than the cause of action available under common-law fraud." *Letoski v. Coca-Cola Co.*, 753 F. Supp. 3d 650, 664 (N.D. Ill. 2024)*; Martin v. Heinold Commodities, Inc.*, 643 N.E.2d 734, 751 (Illinois 1994) ("[T]he intent of the Consumer Fraud Act was to lessen the burden of proof in a claim for certain misrepresentations."). "Therefore, to state a cause of action for statutory fraud, a party need not prove all the elements of common law fraud." *Hanson-Suminski v. Rohrman Midwest Motors, Inc.*, 898 N.E.2d 194, 203 (Ill. App. 2008) (citation omitted).

" 'Intent' under the Act means 'that the defendant intends for the plaintiff to rely on the deception' rather than 'the defendant's intent to deceive' under common-law fraud." *Letoski*, 753 F. Supp. 3d at 664. Conduct is deceptive "if it creates a likelihood of deception or has the capacity to deceive" a "reasonable consumer." *Benson*, 944 F.3d at 646. It is unfair if it offends public

policy; is "immoral, unethical, oppressive, or unscrupulous"; and causes substantial injury to consumers. *Id.* at 647.

A buyer must prove either 1) "the buyer would have acted differently knowing the information" or the act "concerned the type of information upon which a buyer would be expected to rely in making a decision whether to purchase." *Hanson-Suminski*, 898 N.E.2d at 203 (citing *Connick v. Suzuki Motor Co.*, 675 N.E.2d 584, 584 (Illinois 1996)). "Furthermore, a plaintiff's actual reliance is not required, but a plaintiff must show that defendant's consumer fraud proximately caused their injury." *Id.*

Here, a reasonable jury could find that Chojnacki's behaviors, even if often one-step-removed from direct communication with Sol (left for Mikosz to handle), was designed to induce Shankar's reliance on the inefficient and old-school seller narrative in order to secure a future profit on properties that Defendants had not yet purchased themselves. In Response, Plaintiff points to some behavior that is perfectly legal, such as identifying longtime owners and offering them opportunities to sell. (Dkt. 214 at 22). But Plaintiff also has presented evidence of a potential scheme to convince sellers of a bargain real estate deal that simultaneously provided Defendants with a near-guaranteed investment opportunity. (*Id.*) A jury could find that the scheme alleviated some of the traditional risks of real estate investments for Defendants—namely, the ability to flip the property for a profit—by ensuring a buyer was ready to go on the flip before Defendants even finalized their initial purchase. On this record, it remains disputed whether Chojnacki's conduct "concerned the type of information upon which a buyer would be expected to rely in making a decision whether to purchase." *Hanson-Suminski*, 898 N.E.2d at 203.

Defendants also contend that Shankar has presented no evidence of damages because he has not sufficiently tied damages to this part of her claim. (Dkt. 205 at 12). Yet Sor has offered

some evidence on the alleged six-figure damages from unexpected repairs, unexpected code compliance, unexpected building code violations and evictions, and it is up to the jury to assess the validity, if any, of that sum. In analyzing a claim under the Illinois statute, courts consider "the totality of the information made available to the plaintiff." *Benson*, 944 F.3d at 646 (citing *Davis v. G.N. Mortg. Corp.*, 396 F.3d 869, 884 (7th Cir. 2005)). That inquiry, by its definition, will peer beyond the singular "seller's identity" quotation to assess the full picture available to Sor in his dealings with Defendants.

**c. Count IV: Illinois Real Estate License Act**

Under the Illinois Real Estate License Act, licensees "shall treat all customers honestly and shall not negligently or knowingly give them false information." 225 Ill. Comp. Stat. Ann. 454/15-25. "A licensee engaged by a seller client shall timely disclose to customers who are prospective buyers all latent material adverse facts pertaining to the physical condition of the property that are actually known by the licensee and that could not be discovered by a reasonably diligent inspection of the property by the customer." *Id.* The Act "protects real estate licensees when they make false statements if the false information was provided by the property owner and the broker had no reason to believe the information was incorrect." *See Aharon v. Babu*, 2023 WL 2214429, at *6 (N.D. Ill. Feb. 24, 2023). In other words, it requires a plaintiff to prove "that the false information (i) did not come from the seller, (ii) was material to the buyer, and (iii) caused damages." *Edson v. Fogarty*, 138 N.E.3d 238, 246 (Ill. App. 2019).

Defendants acknowledge that Hui was arguably a customer, and thus, under the Act, Chojnacki had a duty to refrain from supplying him false information. (Dkt. 209 at 14). Instead, they argue that Hui has testified that the substance of their only meaningful interaction involved

Chojnacki facilitating Hui receiving requested due diligence information. (*Id.* at 14). Thus, the duty was never breached.

Rather than engage with this contention on the substance, Plaintiff recites the general theory of the case with conclusory assessments, declaring the arguments "without merit" and following that with an excerpt from an expert report and general references to dozens of exhibits without citation, the majority of the 56.1 statement, and zero references to case law. Plaintiff does not identify a specific misrepresenting statement from Chojnacki, instead offering general testimony that he was involved in representing Hui as his broker. Mere conclusory assertions, whether made in pleadings or in affidavits, are not sufficient to defeat a proper motion for summary judgment. *First Commodity Traders, Inc. v. Heinhold Commodities, Inc.*, 766 F.2d 1007, 1011 (7th Cir.1985).

"Judges are not like pigs, hunting for truffles buried in" the record*.* *Albrechtsen v. Bd. of Regents*, 309 F.3d 433, 436 (7th Cir. 2002). Thus, the Court will not "address those arguments which it finds incomprehensible." *Pope v. United States*, 2012 WL 5389807, at *2 (N.D. Ill. Nov. 1, 2012) (citing *Smith v. Town of Eaton, Ind.*, 910 F.2d 1469, 1470-71 (7th Cir. 1990)); *United States v. Anzaldi*, 2013 WL 393326, at *5 (N.D. Ill. Jan. 31, 2013) ("the Court refuses to address nonsensical arguments") (citing *Morton v. Greer,* 61 F.3d 906, 906 (7th Cir. 1995) (stating that briefs which contain no identifiable argument will be dismissed)); *Schramm L. Grp., LLC, v. Pitney Bowes Inc.*, 2026 WL 636820, at *2 (N.D. Ill. Mar. 6, 2026) ("The Court needn't consider . . . 'underdeveloped, conclusory, and undeveloped' argument[s].") (cleaned up) (quoting *Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 718 (7th Cir. 2012)); *United States v. Vance*, 2022 WL 1831138, at *1 (7th Cir. June 3, 2022) ("courts need not address arguments . . . that are 'too weak to require discussion' ") (quoting *United States v. Joiner*, 988 F.3d 993, 995 (7th Cir. 2021)); *Smith,* 910

F.2d at 1470–71 (the Court "cannot be called upon to supply legal research and organization to flesh out a party's arguments"). Accordingly, the Chojnacki Defendants are entitled to summary judgment on Count IV.

**d. Count VIII: Unjust Enrichment**

That leaves the final state-law claim: Count VIII: unjust enrichment. Both sets of Defendants moved for summary judgment on Count VIII. As they did in *Stafford* and *Chen*, Plaintiffs' attorneys once again incorrectly claim that Defendants' argument "relies entirely" on *Community Bank of Trenton v. Schnuck Markets, Inc.*, 887 F.3d 803 (7th Cir. 2018), a case featured in the Murphy Defendants' brief (Dkt. 206-1 at 5), without acknowledging the case law in the Chojnacki Defendants' brief (Dkt. 209 at 16). Even so, Plaintiffs' contentions are misinformed. As this Court has already spelled out in *Malik*, Illinois law does not consider unjust enrichment an independent cause of action. *See Benson v. Fannie May Confections Brands, Inc.*, 944 F.3d 639, 648 (7th Cir. 2019) (finding no standalone claim for unjust enrichment under Illinois law); *Flores v. Aon Corp.*, 242 N.E.3d 340, 356 (Ill. App. 2023) (quoting *Charles Hester Enterprises, Inc. v. Illinois Founders Insurance Co.*, 484 N.E.2d 349 (Ill. App. Ct. 1985), *aff'd*, 499 N.E.2d 1319 (Ill. 1986)).

To the extent that the unjust enrichment claim is premised on the ICFA, the unjust enrichment claim can survive dismissal with regard to the Chojnacki Defendants. *See id.* at 741–42; *Ass'n Ben. Servs. v. Caremark Rx, Inc.*, 493 F.3d 841, 855 (7th Cir. 2007) ("[W]here the plaintiff's claim of unjust enrichment is predicated on the same allegations of fraudulent conduct that support an independent *claim* of fraud, resolution of the fraud claim against the plaintiff is dispositive of the unjust enrichment claim as well."). The unjust enrichment claim is barred as a tag-on to the alternative state law claims for the Chojnacki Defendants. Similarly, because there

are no alternative state law claims as to the Murphy Defendants, that Motion is granted with regard to Count VIII. *See Mashallah, Inc. v. W. Bend Mut. Ins. Co.*, 20 F.4th 311, 324 (7th Cir. 2021). ("To the extent that the unjust enrichment claim is premised on the ICFA or [common-law fraud] claims, the unjust enrichment claim cannot survive the proper dismissal of those matters.").

**CONCLUSION**

For the below reasons, the Chojnacki Defendants' Motion for Summary Judgment [208] and the Murphy Defendants' Motion [206] are granted in part and denied in part. The Motions are granted with regard to Plaintiff's attempt to proceed under 18 U.S.C. § 1964 on a theory of speculative profit loss; they are otherwise denied as to the RICO claims, which remain in the case in accordance with the analysis herein. The Court also grants the Murphy Defendants' Motion on Count VIII (thus granting that Motion in full). The Court also grants the Chojnacki Defendants' Motion with regard to common-law fraud (Count II); violation of the IRELA (Count IV); and negligent misrepresentation (Count V); it denies the motion as to violation of the ICFA (Count III) and the follow-on claim of unjust enrichment (specifically for the Chojnacki Defendants) (Count VIII), which remain in the case and will proceed to trial unless the parties can reach a settlement.

Virginia M. Kendall
United States District Judge

Date: September 9, 2026